## TOM, A COLORED BOY, *v.* DAILY AND DESHA.

Where a slave is purchased under a promise to emancipate, such promise may be specifically executed in equity, against the purchaser, and against subsequent purchasers, without notice.

THIS was an injunction to restrain the defendants from interfering with the personal liberty of the complainant; and was reserved for decision by the Supreme Court in Hamilton county.

The bill, which was filed in the court of common pleas January, 17, 1829, in the name of Tom, by his next friend, Orange Witt, charged that Kate Daily, the mother of Tom, and sister of the defendant, Thomas Daily, was formerly a slave of Miss Baker, of Mason county, Kentucky, who intermarried with one Alexander Edwards. That Edwards died in 1823, and at a public sale made by his administrator, on the 8th of December of that year, Kate, being then *privement ensciente* with the complainant Tom, was sold to the defendant, Daily, brother of Kate, for the sum of one hundred and sixty-one dollars. At this sale, Daily made public proclamation, that his sole object in purchasing Kate was, to liberate her from slavery, and requested the bystanders to aid him in his benevolent purpose, by permitting him to purchase her without competition. In consequence of this public declaration, Daily purchased Kate without opposition, and immediately thereafter, pronounced her a free woman, and on January 12, 1824, duly emancipated her by deed. Soon after the sale, Kate removed to plantation of James Dummitt, of Mason county, Kentucky, where 369] she has ever since resided and where the *complainant, Tom, was born, soon after the purchase and verbal emancipation of his mother, Kate, by the defendant, Daily. Tom always lived

with his mother, until she placed him, a short time since, under the protection of his next friend, Orange Witt, in Cincinnati.

Some time in April, 1828, the defendant, Daily, purchased a slave of the defendant, Joseph Desha, and to secure a part of the purchase money, gave Desha a bill of sale of the complainant. This bill of sale was to be void, if the purchase money should be paid by October 7, 1829. At the time this bill of sale was made, complainant was living with his mother, and he was not delivered to Desha. A short time before this bill was filed, Desha threatened to seize the complainant and reduce him to slavery, but his mother, hearing of these threats, sent him to Cincinnati, under the protection of Witt. Desha then made application to the mayor of Cincinnati, who issued his warrant, by virtue of which, the complainant has been taken into custody. The bill charges that Desha, when he took the bill of sale, knew that Daily never had possession of the complainant, and also knew that his mother Kate, on and before the birth of complainant, was equitably emancipated, although no deed of emancipation had been actually executed.

Prayer, that the defendants be enjoined from further interfering with the person of the complainant, and to restore him to freedom, etc.

Desha answered and admitted the pedigree of the complainant, as set forth in the bill, and also the sale made by the administrator of Edwards, but denied all knowledge of the declarations made by Daily of his intention to emancipate Kate. He denied that Kate was emancipated until six months, or more, after complainant was born. He admits that Kate, shortly after she was purchased, moved to the farm of James Dummitt, and alleges that when he purchased complainant from Daily, he left complainant with Dummitt, where he was to remain until he called for him. He denies that he knew when he purchased complainant that Daily never had possession of complainant; but Daily at that time informed him that he never intended to emancipate complainant. After defendant had bought the complainant, *he agreed to let the com- [370 plainant remain with Dummitt for a certain length of time, and that, if within that time, Daily paid him one hundred and twenty dollars, the purchase was to be canceled, and defendant was to restore the possession of complainant to Daily.

Daily also answered, admitting all the material allegations in the bill. He further stated that the complainant was not delivered.

to Governor Desha, at the time the bill of sale was executed, and that it was agreed between himself and Governor Desha, that Kate should not be informed of the bill of sale upon Tom, and that Governor Desha requested Dummitt to keep the matter a secret from Kate.

He neither denies nor admits the freedom of Tom, but alleges that he will pay Desha the hundred and twenty dollars when it becomes due.

It was proved, on the part of the complainant, that the sale of Kate was made, as set forth in the bill, and that she was declared free by Daily, the purchaser.

It was agreed between the parties, in writing, that Tom was born five months previous to the emancipation by deed, that neither Daily nor Desha had ever had the possession of Tom, and that Daily verbally told Desha he delivered the boy into his possession.

Robert Blanchard and John Rankin, on the part of the defendant, testified, that, in May, 1829, they heard the defendant, Daily, say that the sale of Tom to Desha was fair and *bona fide*, and the delivery was intended to be a delivery in fact of the possession.

Simon Baker testified that he had heard Daily claim Tom as a slave, and once said he would give him to the daughter of witness.

James Dummitt was present at the sale of Tom to Desha. The bill of sale was absolute, and was dated March or April, 1828. Daily delivered to Desha the possession of the boy, and at Daily's request he was permitted to remain with his mother. Desha requested witness to take charge of Tom until he should call for him. Witness kept the boy till he was carried to Cincinnati by his mother. After the sale was made, Desha agreed that if Daily would pay him one hundred and twenty dollars in eighteen months, 371] he would reconvey the boy Tom to *Daily. This agreement was reduced to writing, but it formed no part of the original bill of sale.

Hannah Paine was present at the sale of Edwards'. property. It was generally understood, by persons present, that the intention of Thomas Daily in purchasing Kate was to free her from slavery, and in consequence of this understanding Kate was sold for less than half value. After the sale, Daily declared that Kate was a free

woman and must provide for herself. James Dummitt was at the sale and purchased four of Kate's children, and requested Kate to go and live with him and bring up the children, and he would build her a cabin and find her provisions. Kate complied, and Dummitt sent his wagon and took Kate and the children home.

The court below dissolved the injunction and dismissed the bill, and the complainant appealed to this court.

No arguments were presented on either side.

By the Court:

This is a contest between the complainant, a colored boy, who asserts his freedom, and the defendant, Joseph Desha, of the State of Kentucky, who claims the complainant, as a fugitive slave, under the act of Congress of 1793. The only serious question between the parties seems to be whether the acts and declarations of the defendant, Daily, before the birth of the complainant, constitute such an emancipation of the complainant's mother as a court of equity will enforce.

It is a well-settled rule that no man shall take advantage of his own wrong. The conduct of Daily at the administrator's sale was a fraud. By his declarations and promises he was enabled to purchase his sister at less than half value; and that, too, by imposing on the humanity of the by-standers. Will a court of equity now permit him to turn round and claim his sister and her offspring as slaves? Where a widow stands by and hears her deceased husband's estate proclaimed for sale, free from dower, at public vendue, and is *silent, she shall be forever estopped to assert [372 her right of dower. 2 Ohio, 506. Where a grazier, driving a flock of sheep to London, was encouraged by an innkeeper to put his sheep into a pasture belonging to the inn; the landlord seeing the sheep consents that they shall stay there one night, and then distrains them from rent. The plaintiff was compelled to replevy, and at law the landlord had judgment; the plaintiff there filed his bill, and was relieved, upon the ground that the landlord should not take advantage of his own wrong. 2 Ves. 129.

This question, however, seems to be settled, and the controversy between these parties put at rest, by the Court of Appeals in Kentucky. 1 Bibb, 422. In that case it appears that one Thompson purchased a slave, named Will, from Ruth Wilmot, and expressly stipulated that he would manumit and emancipate Will in seven

Tom, etc. *v.* Daily and Desha.

years. Will served the term of seven years, and then instituted a suit at law to recover his freedom, but failed, because the agreement was held not to amount to an actual and formal emancipation under the laws of Kentucky.

Will then continued in the service of Thopsmon for several years, until Ruth Wilmot, in behalf of Will, filed a bill in chancery setting forth the above facts, and which were admitted by the answer. The circuit court decreed that Will should be emancipated, and that Thompson should pay to Wilmot, in trust for Will, six hundred and ninety-one dollars and twenty-five cents, the value of his services after the expiration of the seven years From this decree Thompson appealed, and Bibb, Chief Justice, in delivering the opinion of the court, affirming the decree, uses this language : " That the answer of Thompson does not afford a colorable pretext for withholding a performance of his engagement,. solemnly made, under circumstances interesting to humanity and most obligatory upon a man of good conscience and unparalleled faith. The contract in itself was not forbidden by any political institution, but is in unison with the dictates of natural right, and was a most becoming subject for the court of chancery to act upon specifically."

We surely may be permitted to apply these doctrines to a case **373**] where a *brother* is seeking to reduce *his sister and her *offspring* to slavery, in direct violation of his repeated and most solemn engagements.

The mother, then, in equity, which considers that as done which was agreed to be done, was virtually, if not actually and formally, free at the time of the birth of the complainant. It necessarily follows that the complainant was free. *Partus sequitus ventri.* 1 Littell, 319.

The complainant, therefore, being free born, is not the subject of property, and neither Daily nor Desha, who claim under him, have any rights as against the person of the complainant.